PAINE'S CHAPEL OF AFRICAN METHODIST EPISCOPAL CHURCH ET AL., *v.* ABERDEEN REALTY Co.

[81 South. 650, Division A, No. 20649.]

RELIGIOUS SOCIETIES. *Incorporation. Right to be sued. Judgment against.*

A religious society which has never resolved itself into a corporation or "organized body" in accordance with the provisions of section 933, Code 1906 (Hemingway's Code, 4109) cannot act or be dealt with as such, and a sale of lands under execution against such a society conveys no title.

APPEAL from the chancery court of Monroe county. HON. A. J. McINTYRE, Chancellor.

Bill by the Aberdeen Realty Company, against Paine's Chapel of the African Methodist Espiscopal Church, and another. From a decree for plaintiff, defendant appeals.

On the 17th day of July, 1916, the Aberdeen Realty Company, a partnership composed of Charles Treas, Rollin D. Fitts and M. T. Birch, filed an original bill in the chancery court of Monroe County, against Paine's Chapel, African Methodist Espiscopal Church, J. C. McCottry, its pastor, Robert Killer, George Heard, Tolly Brown, W. M. Daniel, Jim Holliday, Milton James, and F. D. Tiger, trustees, and also against the Board of Church Extension of the Church. Extension Society of the African Methodist Episcopal Church, a Pennsylvania Corporation, B. F. Watson, its secretary and treasurer. In its bill of complaint the Aberdeen Realty Company claimed to be the owner of the church house and lot and the parsonage occupied by the pastor, all described in the bill, and deraigned its title to the property setting up the deed to the then trustees of the church of Joel M. Acker, copied in the record, page 112, and stating that Joel M. Acker was the common source of title and the defendants claimed to own the property and were in possession of it, and that their claim cast a cloud on complainant's title. The foundation of complainant's claim to the property was two several deeds executed by T. M. McDuffie, Marshal and Ex=office constable to complainants, copied with exhibits at pages 61 and 67 respectively of the record. The complainant claimed that these two constable's deeds conveyed to it the property absolutely and were founded on two several executions issued to satisfy two judgments against the church rendered by James M. Acker, Mayor of Aberdeen and ex-officio justice of the peace, one rendered on the 14th day of October, 1915, for one hundred and twenty-five dolars judgment No.

73 on the docket of the said Acker; and one rendered the 9th day of September, 1915, for one hundred and fifty dollars, No. 79 on the docket of J. M. Acker, Mayor and ex-officio justice of the peace. The consideration of the first deed named was one dollar and the second deed fifteen dollars and fifty cents. It is shown by sundry proof in the case that the value of the church house, parsonage and lot ranges from one thousand, seven hundred and eighty dollars as shown by Addison Brannin, Contractor, at page 152, up to two thousand, five hundred and ninety-nine dollars shown to be the valuation of the property as fixed by the church officers and reported to the conference.

Process was issued on the 6th of July to the resident defendants, which is copied in the record at page 9½. The process runs to George Heard, Trustee, and J. C. McCottry, pastor, the presiding and chief officer of Paine's Chapel, African Methodist Episcopal Church, and it was executed by handing to Heard and McCottry each a copy of the process. No other process was served on the church or resident defendants. The board of Church Extension, a Pennsylvania corporation, engaged in lending money to indigent churches was brought into court and filed its answer at page 10 of the transcript, and adopted the answer of Heard, trustee, and McCottry, pastor, latter to be referred to and in its answer showed that it was by assignment, the owner of a certain deed of trust executed by the trustees of the church to C. C. Brown, trustee, for A. J. Brown for loaned money; that the said Board of Church Extension had taken an assignment of this trust deed and it is made an exhibit to the complainant's bill, and with the notes it secures is found copied in the record as part of the deposition of B. F. Watson, pages 92-107 of the transcript. It will be found that the trust deed was executed by the pastor and the trustees of the church and was duly assigned to the Board of Church Extension as shown at page

198 of the transcript. The Church Extension Board also showed that the said A. J. Brown, after transferring and delivering said deed of trust and notes to B. F. Watson, secretary and treasurer of the Church Extension Board, went to the record and marked on the record that the trust was satisfied on Nov. 1, 1913, as shown by the deposition of B. F. Watson, page 94; and after B. F. Watson had paid Brown the amount due on the deed of trust and had the same transferred and delivered to him, the Church Extension Board claimed the property under this trust deed, made its answer a cross bill and asked the foreclosure of the deed of trust.

George Heard, the trustee and J. C. McCottry, the pastor of the church, filed their answer to the bill found at pages 14-21 and the trustee in the deed of trust, C. C. Brown, filed a formal answer, submitting himself to the jurisdiction of the court. Heard and McCottry set up in their answer that the church was governed by the Book of Discipline which embraced the laws of the church, by which alone the property of the church could be controlled or encumbered. These respondents averred that while theye were served with process they were without authority to represent the church as a whole and that the only way to bring the church into court was to make all the trustees parties to the bill. They averred that a church house was erected and for building it they had borrowed money from A. J. Brown; and the then trustees executed the trust deed referred to Brown,' that Brown pressed for the money on his trust and that same was taken up by the Board of Church Extension constituted to help indigent and indebted churches; and that the Board of Church Extension took a transfer of the deed of trust and that the said A. J. Brown, without authority and by some sort of mistake or oversight, marked the trust satisfied when it was in fact in full force. Heard, the trustee and McCottry, the pastor, averred that the

two judgments recovered September 15, 1915, and October 14, 1915, on which executions were issued, and the church pretendedly sold to the complainant were void judgments; that the pretended debts on which the pretended judgments were rendered were no legal obligations against the church because they were attempted to be created by one W. C. Thomas, its pastor, without authority from the congregation or the trustees acting in their organized capacity and by authority. They averred that the alleged judgments were for the pretended purchase of a new parsonage, when they already had one, and when its purchase was not authorized by a majority of the legal voters of the church and in a manner alone authorized by the church discipline and the laws of the church, which were controlling. That these debts were contracted by the machinations and frauds of this pastor, Thomas, and were in no manner binding. The answer also alleged that only one or two of the pretended trustees, when the church then had five, and the pastor, were served with process when the pretended judgments were recovered before J. M. Acker, mayor and ex-officio justice of the peace; that the church as a legal body was not brought into court through its trustees or a majority of them so that they might defend the rights of the church as against said judgments. That the only trustee who was brought into court failed and refused to defend the claims of the complainants in violation of their duty and that for many formal matters required for a valid judgment as set out in the answer and elaborated hereafter in the brief, the said judgments were void and the conveyances of McDuffie, the constable, in their execution were void.

The cross bill was answered by the original complainant and the cause went to trial on the original bill, the answer of McCottry, the pastor, and Heard, the only trustee served, and the cross bill of the Church Extension Board asking a foreclosure of its deed of

- trust and the formal answer of the trustee, C. C. Brown. '

*Leftwich & Tubb,* for appellants.

As to the question of the manner of service of process it will be seen that appellees rely on section 933 of the Code 4109, Hemingway's Code. The first division of our brief, we think demonstrates the error of counsel for appellees and also the error of the court in sustaining the process in this case by reason of that section. Paine's Chapel A. M. E. Church is no corporation but a mere religious association, so that its disicipline and the laws of the church control in the matter of contracts and the devolution of its property. The process in the instant case, in the court below brought in McCottry, the pastor, and George Heard, one of the then trustees, but it left the other six trustees out. The church never did appear by attorney or otherwise. McCottry and Heard answer and protest that they could not represent the entire church and did not make their answer a special plea to that effect; and yet the lower court held that the process brought the church into court. We have demonstrated in the main brief we trust that the process for either one or two of the trustees in the two justice court suits could not and did not bring in the church.

In their brief, counsel for appellees say that the fault in the process and the essentials necessary to show a valid judgment on the justice docket, were cured because Paine's Chapel, A. M. E. Church appeared, and quote the recitation in the judgment "Came the parties," and asserts that this means a general appearance of the church and renders the two judgments valid. Counsel for appellees overlook that they came into a court of chancery asserting title to a church house acquired under a constable's sale, based on judgments rendered in a justice court, which is a court of limited jurisdiction with nothing presumed in its favor. It will be observed also that the defendant, the Church Extension Society, a corporation, adopts the

answer of McCottry and Heard and makes its answer a cross-bill, assailing the validity of the judgments and the validity of the 'pretended deeds under which the complainant below claimed the property: Appellant's attack on the judgments was a direct attack and not a collateral attack. *McKinney* v. *Adams,* 50 So. 474.

Not only that, but the appellees came in sheltering themselves under these two justice judgments and it was perfectly legitimate to show by the evidence before the chancery court that neither the church itself nor the trustee in fact, appeared by attorney or in person. *Swain* v. *Gilder,* 61 Miss. 667.

In the case last cited the judgment recited the appearance of the plaintiff in open court and a confession of the judgment, but this court held that it was perfectly legal to show the facts, that there was in fact, no judgment at all. In the two judgments in question in the instant case the recital "Came the parties," amounts to nothing when the proof indisputably shows that the parties never did come. There were five trustees at the time. Justice Acker, at most thought there were three of the trustees there, but he did not know who they were. The proof introduced in the court below shows only one was there, Ed. Beckett, and he was found on the street and brought in by W. C. Thomas, the pastor. There were only two ways for the parties to come and give the appellees valid judgments. The first way was for all five of the trustees to appear in court, either in person or by an attorney in fact, and let the matters in issue be litigated out. As we demonstrated at page 8 of the main brief, the only way for the trustees to bind the church was by acting as a board all together, and not separately. The acts of a part of a board are void and do not bind the estate. In addition to the authorities cited in the main brief we cite further: *Hill* v. *Josselyn,* 13 S. M. (Miss.) 597; *St. Patricks Church* v. *Gravelin,* 25 Am.

Rep. 205, and cases cited; Second Beach on Trustees, secs. 493, 494, 495, 496.

Certainly the congregation was not in court, nobody pretended as much. Ed. Beckett says there was nobody there but himself, the pastor and Mr. McFarland, attorney for the appellees. Neither of the appellees were there and Mr. Acker, the Mayor, is in doubt, but at most he only claims that there were two or three there and whether they were trustees or not he does not know. The only other way the parties could come would be for the entire congregation to appear in court in person or by attorney, and there is no pretense in the proof that this is true. Certainly it was the duty of the appellees to show that the church got into court and it was their duty to know how to get them into court. Those who deal with trustees must be aware that they exercise only limited and delegated powers, and must see that they confine themselves within the scope of their authority. This is the rule of our own court, as shown in *Vernon* v. *Tippah County*, 47 Miss. 181.

Certainly a court of equity again could not allow these judgments to be executed when the court itself decided in its opinion that the basis of the claim was without any merit, and as an original proposition, he would not grant a judgment at all for the appellees, and yet the evidence disclosed that Beckett and Thomas, the pastor, the only trustees shown to be present, made no defense whatever. It is the duty of the trustees' to protect the legal title and to conduct the business of their trust with fidelity and follow the line of duty prescribed in the church law. Second Beach on Trustees, 410-411; *Poor* v. *Williams,* 38 Miss. 546; *Presley* v. *Ellis,* 48 Miss. 574.

Counsel for appellees, in answer to the argument that the pretended contract entered into for new parsonage, when the church already had one, was not authorized by the law of the church and not legally

entered into and that only two, or at least, part of the trustees signed it, and therefore it was void and not binding, save that the church used the house and ratified the contract by making several payments on it, and that one or two collections were taken up at the church meetings for this purpose. We submit that this argument cannot be sustained. At pages 36 and 37, Mr. Treas claims to have held a meeting of the trustees in his negotiations, but the only names he can mention were Heard, Thomas and Swanson, the latter he thinks was there. Heard was not a trustee at all, as shown by the proof; Swanson was dead at the time of the trial. All three living trustees, Beckett, McFarland and Dickson swear they had nothing to do with the matter and were not present, and so the negroes present could not have been trustees, for Mr. Treas does not name them, and the proof is they were not there. The pretended writing itself is at page 154 and only two of the trustees, Summie and Beckett pretendedly signed it. The proof is that while Wood's name is on the copy he did not sign the original, by admission of Treas. Moore was not a trustee so that it necessarily follows that Mr. Treas is mistaken for the trustees could only act in a body and as a whole, and not in fragments. According to Herndon, the witness who built the new parsonage, there had been no trustee's meeting up to that time. Thomas, the Pastor, said they were going to meet on that night. Herndon afterwards claimed that Thomas said they did meet, but he averred that all he knew was what Thomas told him. The statements of Thomas were objected to as incompetent and when admitted, the admission was excepted to. Rollin Fitts, the other member of the firm on the stand, only states the trustees met. He admits he was not there. At page 57 young Herndon swore there was a committee came there, but who the committee was he does not know. At page 60 he identified two of them, Will Dickson and James

Moore. Dickson was a trustee but Moore was not When Dickson took the stand he swore he was not there. Certainly there was no meeting.

As to the payments on the debt, McCottry, the then pastor under cross-examination, admitted that there was some minute on the church book showing a payment to the appellees of twelve dollars and fifty cents. That minute is quoted at page 128 of the transcript and shows a payment of twelve dollars and fifty cents to the appellee company January 13, 1915, and shows small payments to other creditors of the church March 23, following, but no other to this appellee. This minute is signed by Mrs. H. E. Moore, a woman, and it was not an official meeting as the witness swore, because under the law of the church women are never allowed to be officers. In truth we suppose the court will recognize the fact that in the great family of Methodist churches, women are not allowed to be officers of the church under their various constitutions, not even Sunday School Superintendents. Certainly this one payment made to the Realty Company is no ratification of the trustee's unauthorized act, for it was in no sense official. There was only one way for the church to authorize the trustees to buy a new parsonage, if it could be done at all, and that way was by a majority of the legal voters of the church. We have shown that no such vote was ever taken. We submit that the only method of ratification would have been the same way: *Thomas* v. *West,* 49 L. R. A. 22; *Parshley* v. *Third M. E. Church,* 30 L. R. A. 574.

We submit that the testimony fails absolutely to show: first that the church or the trustees as a board ever authorized the purchase of a new parsonage; second there was no ratification by the church or by the trustees. W. C. Thomas, the pastor, who was ambitious for a better house, moved out of the old parsonage into the new one, but it is not shown that the church ever authorized it. The old parsonage re-

mained there for him. The presiding elder, Woods, swore he tried to get Thomas to move out of it and he refused. When Thomas was displaced the next year and McCottry came, he immediately moved out and occupied the old parsonage. So far as the proof showing ratification, it shows repudiation. The church refused to approve the new parsonage or use it, and all the proof shows that there was general opposition to it.

Counsel says that the evidence shows one or two collections were taken up at church meetings for this purpose. In this he is mistaken. Two church rallies were testified to by James Moore and Will Dickson, but these rallies were to raise money to pay a debt to Lann & Carter for beautifying the church and had no relation whatever to the debt claimed by appellees. The fact that Thomas got a few women in the church to hold a meeting and make a payment or two on his debt, as the testimony shows he did, certainly cannot commit the church as a religious society nor can it commit the trustees when they opposed it all the while as an unauthorized and unnecessary debt. In this case the church is not in the attitude of getting and keeping something and refusing to pay for it.

Counsel claims that the church's right to acquire a new parsonage can only be questioned by the state. They overlook that this church is not a corporation, it is a church association living under its own book of laws and can only be obligated to an indebtedness legally through its board of trustees. The state has nothing to do one way or the other with matters of this sort. In the matter of conveyance and disposition of its property and in the matter of the creation of debts, the rules and discipline of the church measure the powers of those acting for it and those dealing with the church are charged with knowledge that its trustees have limited powers. This is the holding of the courts everywhere. Besides the case cited from our own court in the original brief, see *St. Patricks Church* v.

*Gravelin,* 255 Am. Rep. 305, and *West* v. *First Presbyterian Church,* 4 L. R. A. 692; *Railroad* v. *Bensley,* 19 L. R. A. 796.

We do not contend that a church is not liable for its debts, and that in a court of equity, after the legality of a debt has been ascertained, according to law, a court of equity will sell the church's property for the payment of a debt which is meritorious, and which it justly owes.

Counsel on the second page of their brief, say that "a church ought to be the last institution to repudiate a debt." We agree to this statement, but the chancellor, in his opinion in deciding this case, used this language:

"Under the proof in this case, if the realty company was bringing suit against the church to condemn the property for the payment of the debt, with the proof as offered to-day, I would unhesitatingly deny the relief, for I do not think that this church which has in its discipline that before the board of trustees is authorized to make this kind of a contract, the matter must be submitted to the church as a whole and only those who have arrived at a certain age can vote and the majority of that congregation must vote on it and authorize it before this contract can be made. That clearly was not done, etc."

The court goes on then to speak of the fact that the minister moved into the new parsonage, but certainly the church is not bound by his individual act. As we have shown, he was only humoring his own ambition and wants and moved out of another parsonage the church had furnished him, amply sufficient for himself and family. Certainly the protection of the courts is properly invoked in a case like this. The lower court set aside the execution sales but fixed the cost of them and the original indebtedness, now amounting to about five hundred dollars against the church, and made it a prior lien to the mortgage securing the money, by

which it was built, and taken up by appellant, the Church Extension Board.

The courts of this state have never determined, so far as we know, the questions here submitted as touching the suit for debt, and the matter of subjecting the church's property and the manner of getting the church into court, and the force and meaning of section 933 of the Code of Mississippi. We submit that the case ought to be reversed.

*McFarland & Holmes,* for appellee.

As stated by counsel for appellant the sole and only question involved in this cause is one of process and the validity of the judgment in favor of appellee against appellant church in the court, of J. M. Acker, Justice of the Peace. The Chancellor before rendering his decree in this case took it under advisement, and after mature deliberation and investigation of the authorities on these points decided in favor of the appellee.

Section 933, Mississippi Code of 1906, provides how process may be served on religious societies, one of said provisions being for service on the presiding or chief officer of the church. We do not think there is any merit in counsel's argument that this church was never incorporated and was not liable under process served under said section 933; a mere reading of said section clearly shows that appellant was amendable to such process, the testimony showing that the pastor was the presiding or chief officer of the church.

The court will observe that there were two judgments in the justice of the peace court against appellant church, and that a sale was made by virtue of an execution in each case; so that if there should be error in one judgment the other might be valid. We also call the attention of the court to the fact that the constable made an amended return of the process in the first case, which return is correct and proper.

In addition to our contention that the process in the justice of the peace court and also in the chancery court, was proper and binding, appellant church was bound by the judgment in the justice of the peace court because it appeared; consequently the judgments are valid and binding without process of any kind, and cannot be attacked. 24 Cyc. p. 590.

"An entry in a justice's docket 'Parties appeared' means a general appearance" and all objections as to jurisdiction are waived by a general appearance, 24 Cyc., p. 529, and Note 63. These judgments recite "Came the Parties," which means the plaintiff and the defendant, and is sufficient to show an appearance by the defendant church and make the judgments valid and binding. The Discipline and Rules of the church have absolutely nothing to do with this cause. The same rules of law apply to this case as to any other. 90 N. W. 492.

The cases cited by counsel in 51 Miss. and 79 Miss. are not at all in point; neither do those cited from Perry on Trust, 24 A. & E. Enc. of Law, 34 Cyc. and 26 Enc. Pleading & Practice bear upon this controversy in the slightest degree.

The rightfulness or wrongfullness of the contract between appellee and appellant church has been settled by the judgment in the justice of the peace court and cannot be relitigated in this cause. Although counsel for appellant contends that appellee fraudulently induced the church to enter into a contract with it, the evidence shows the exact reverse. Appellee had begun the building of this house for another purpose when appellant church caused it to stop construction work, change the plans and build a parsonage for the church. Appellee did nothing until a meeting of the church members and the church trustees was held and the contract agreed to by appellant church. Appellant church used the house, ratified the contract and made several payments on it as provided by the contract;

the evidence showing that one or two collections were taken up at church meetings for this purpose. A church should certainly be the last institution in the world to repudiate a debt and defraud a party out of a just obligation. In this particular case the court has decreed that the sale of the church property shall be set aside and the church be given time in which to pay off this debt and retain its property; certainly no fairer decree, so far as appellant church is concerned, could have been rendered.

The matter of the church's right to acquire a new parsonage can only be questioned by the state, and does not concern the parties hereto. *Hamsher* v. *Hamsher*, 8 L. R. A. 556; *Hanson* v. *Little Sisters of the Poor*, 32 L. R. A. 293 and notes; *Farrington* v. *Putnam*, 38 L. R. A. 339; *Quitman County* v. *Stritze et al.*, 70 Miss. 320. Upon the question of ratification of contracts by religious associations and estoppel thereby see 34 Cyc. 1136 and notes and 24 A. & E. Ency. of Law, p. 370.

The church site is liable to sale under execution for debts of the church 12 L. R. A. and cases cited thereunder in L. R. A. Cases as authorities; 34 Cyc. 1163.

The trust deed as signed to the extension board of the church having been marked satisfied by the trustee prior to the rendition of these judgments, and appellee having no actual knowledge of the error of the trustee in so marking it, appellee's claim is superior and prior to that of the church board of extension.

SMITH, C. J., delivered the opinion of the court.

The appellee exhibited its bill in the court below against Paine's Chapel of the African Methodist Episcopal Church and the Board of Church Extension of the Church Extension Society of the African Methodist Episcopal Church, praying that their claim to certain land claimed by the appellee to be owned by it be

canceled as a cloud on its title, and there was a decree in accordance therewith. The summons for Paine's Chapel was served on its pastor and several of its trustees. An answer was filed by the board of extension. No answer was filed by Paine's Chapel, but its pastor and trustees answered, disclaiming any authority to represent the chapel.

The land in question was conveyed several years since by the then owner thereof to several persons in trust for the use and benefit of the members of the African Methodist Episcopal Church in the United States, and Paine's Chapel now maintains thereon a house of worship and also a residence for its pastor.

The appellee obtained two judgments in suits filed by it in the court of a justice of the peace against Paine's Chapel of the African Methodist Episcopal Church, the process therein having been served upon its pastor and several persons designated as its trustees. Executions were issued on these judgments, and the land here in question was sold thereunder and purchased by the appellee.

The sale of the land to the appellee under the executions against Paine's Chapel must be held to convey to it no title thereto, one sufficient reason therefor being that it does not appear that Paine's Chapel ever resolved itself into a corporation or "oraganized body" in accordance with the provisions of section 933, Code of 1906 (2 Hemingway's Code, section 4109), and unless this has been done, it cannot act or be dealt with as such.

*Reversed and remanded.*